UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STATE STREET CORPORATION,
    Petitioner,

    V.                                   CIVIL ACTION NO.
                                            19-mc-91107-LTS

ANATOLIE STATI et al.,
    Respondents.

**MEMORANDUM AND ORDER RE:**
**THE STATIS' MOTION TO LIFT STAY**
**(DOCKET ENTRY # 57)**

**June 12, 2020**

**BOWLER, U.S.M.J.**

In May 2019, this court recommended allowing petitioner State Street Corporation's application for a protective order (Docket Entry # 2) to the extent of staying a deposition subpoena "pending resolution of" related proceedings in the High Court of Justice of England and Wales ("the English Court"). (Docket Entry # 44). In a status report filed on May 12, 2020, respondents Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. ("the Statis") move to lift the stay in light of an April 2020 decision and judgment by the English Court. (Docket Entry # 57). On May 29, 2020, petitioner State Street Corporation ("State Street") filed a corrected status report that responds and objects to the Statis' request to lift the stay. (Docket Entry # 60). State Street submits the stay should remain in place pending resolution of: (1) appeals

sought by the Statis, the Republic of Kazakhstan ("ROK"), and the National Bank of Kazakhstan ("NBK") in the Court of Appeal of England and Wales ("the Appeals Court"); and (2) further litigation "indicated" by the Statis in "related proceedings pending in Belgium (the 'Belgium Proceedings')."[1]  (Docket Entry # 60, pp. 2-3).  As discussed below, lifting the stay and proceeding to adjudicate the discovery is appropriate.[2]

---

[1]  State Street does not precisely define the "Belgium Proceedings" in its corrected status report although it references (Docket Entry # 60, p. 11) the English Court's findings of two matters the Statis "wish to argue before the Belgium Court" (Docket Entry # 60, pp. 27-29, ¶¶ 43, 44, 46). The two matters are that: (1) "cash, being part of the National Fund [of Kazakhstan], is within the garnishment order as a matter of Belgium law"; and (2) "by reason of a sham trust or indeed fraud[,] BNYM owes the debt to [ROK]."  (Docket Entry # 60, pp. 27-29, ¶¶ 44, 46) (Docket Entry # 60, p. 11).  The Statis delineate the various Belgium Proceedings (Docket Entry # 57-1, pp. 2-5, ¶¶ 4, 14, 17), current time tables for briefing and argument (Docket Entry # 57-1, p. 11, ¶¶ 33, 34, 37, 38) and, more importantly, the issues raised under Belgium and Kazakh law (Docket Entry # 57-1, pp. 5-9, ¶¶ 18, 19, 21-23, 25, 26).  These issues include piercing the corporate veil, whether ROK has a claim against BNYM under Belgium enforcement law, and related matters of Kazakh law.  (Docket Entry # 57-1, pp. 5-9, ¶¶ 21-27). The issues raised allow for a comparison to those raised in this action in order to assess any ongoing simplification of the questions in this action.  See Landis v. N. Am. Co., 299 U.S. 248, 254, 256 (1939) (decision in New York case "may not settle every question of fact and law in suits by other companies, but in all likelihood it will settle many and simplify them all"). The time table of the briefing provides a basis to calculate the prejudice to the Statis in further delaying these proceedings pending a resolution of the Belgium Proceedings.  See id. at 256-257; An Giang Agrie. and Food Imp. Exp. Co. v. United States, 350 F. Supp. 2d 1162, 1164 n.3 (Ct. Int'l Trade 2004).

[2]  Without seeking the required leave of court under LR. 7.1(b)(3), on June 11, 2020, the Statis filed a single-spaced response to State Street's May 29, 2020 corrected status report.

BACKGROUND

In October 2017, an "Attachment Judge of the Dutch Language Court of First Instance in Brussels" (Docket Entry # 32, p. 10, ¶ 18) ("the Belgian Court") issued an ex parte order authorizing the Statis to attach assets held by a London branch of the Bank of New York Mellon ("BNYM") in order to satisfy a $515 million award by an arbitral tribunal of the Stockholm Chamber of Commerce against the Republic of Kazakhstan ("ROK") in favor of the Statis.[3]  (Docket Entry # 6, p. 1, ¶ 2) (Docket Entry # 52, pp. 1-2) (Docket Entry # 32, pp. 9, 11, ¶¶ 11-12, 19).[4]  In response to the garnishment order, BNYM froze National Bank of Kazakhstan ("NBK") cash assets of the National Fund of Kazakhstan ("National Fund") held in accounts subject to a Global Custody Agreement ("GCA") between BNYM and NBK governed by English law ("GCA accounts").  (Docket Entry # 32, p. 6, ¶ 9) (Docket Entry # 60, pp. 17, 19, ¶¶ 2, 10) (Docket Entry # 22, p. 5, ¶¶ 17-18)

---

(Docket Entry # 61).  Not only does the filing violate LR. 7.1(b)(3), but it does not comply with LR. 5.1(a)(2), which requires that "[a]ll documents," except for discovery filings, "be double-spaced."  LR. 5.1(a)(2).  Documents that "do not conform to the requirements of [LR. 5.1(a)(2)] *shall* be returned by the Clerk."  LR. 5.1(a)(2) (emphasis added).  Accordingly, the Clerk is directed to return the document (Docket Entry # 61).

[3]  The amount subsequently increased to approximately $530 million with the addition of attorneys' fees and interest. (Docket Entry # 6, p. 2, ¶ 5) (Docket Entry # 52, p. 2).

[4]  Page numbers refer to the docketed page number in the upper, right-hand corner of the filing.

(Docket Entry # 23, p. 3, ¶ 6(b)) (Docket Entry # 52, p. 2).  The Belgian Court also found that because BNYM in London "held these assets under the terms of" the GCA "subject to English law, the English courts should decide whether the Statis were permitted to attach these NBK assets to satisfy" the arbitral award against ROK.  (Docket Entry # 6, p. 2, ¶ 5) (Docket Entry # 52, p. 2). In June 2018 and as a result of the referral by the Belgian Court, ROK and NBK initiated proceedings in the English Court "to obtain a declaration that the Belgian Attachment did not give the Statis authority to freeze NBK assets held by BNYM in London" ("the English Proceedings").  (Docket Entry # 6, p. 3, ¶ 10) (Docket Entry # 60, p. 17, ¶ 2).

Meanwhile, a 2018 judgment by the United States District Court for the District of Columbia ("the D.C. judgment") confirmed the arbitral award.[5]  (Docket Entry # 7, p. 4, ¶ 18) (Docket Entry ## 7-4, 7-6) (Docket Entry # 29-1) (Docket Entry # 52, p. 3).  Seeking discovery to aid in the execution of the D.C. judgment and foreign judgments enforcing the award (Docket Entry # 22, p. 7, ¶ 25), as provided for under Fed. R. Civ. P. 69(a)(2) ("Rule 69(a)"), the Statis served State Street with the Fed. R. Civ. P. 30(b)(6) deposition subpoena (Docket Entry # 2-1) and a document subpoena.  The latter is the subject of a related

_____

[5]  The United States Court of Appeals for the District of Columbia affirmed the judgment.  (Docket Entry # 7-5).

proceeding between the parties, <u>In re Application for Order
Enforcing a Subpoena</u>, Civil Action No. 19-91214-LTS ("C.A. 19-
91214-LTS").  (Docket Entry # 3-9) (Docket Entry # 3, p. 5, ¶
13).  Each subpoena seeks similar information or documents
regarding: assets owned directly, indirectly, jointly, or
beneficially by ROK; debts owed to or by ROK; debts owed to or by
NBK; debts owed to or by the National Investment Corporation of
the National Bank of Kazakhstan ("NIC"); accounts maintained by
State Street on behalf of NBK, including accounts held as manager
of National Fund assets; accounts maintained by State Street on
behalf of NIC, including accounts held to manage National Fund
assets; State Street's management role with respect to the
National Fund; and various communications identifying ROK, NBK,
and NIC.  (Docket Entry # 2-1) (Docket Entry # 3-9, C.A. 19-
91214-LTS).  The relationship between ROK, NBK, and the National
Fund is therefore materially relevant to this action as well as
C.A. 19-91214-LTS.

       In recommending the stay in May 2019, this court analyzed
various factors.[6]  Initially, this court noted that, "Among the

_____

       [6] Factors include:

       (1) similarity of parties and issues involved in the foreign
       litigation; (2) the promotion of judicial efficiency; (3)
       adequacy of relief available in the alternative forum; (4)
       issues of fairness to and convenience of the parties,
       counsel, and witnesses; (5) the possibility of prejudice to
       any of the parties; and (6) the temporal sequence of the
       filing of the actions.

issues to be resolved in the English Proceedings are 'the nature of the relationship between NBK and Kazakhstan and between each of them and the National Fund,' as well as whether NBK assets held by BNYM are 'the property of, or property held for, Kazakhstan rather than (or as well as) NBK.'" (Docket Entry # 44, p. 4) (quoting Docket Entry # 32, p. 16, ¶ 5(d)).  This court reasoned that because "State Street provides services to NBK, not ROK (Docket Entry # 8, p. 6), issues of the relationship between ROK and NBK and whether NBK assets can be attached to satisfy the award against ROK are highly relevant to the question of whether the Statis may seek discovery of State Street's management of NBK assets." (Docket Entry # 44, p. 4).  As also stated, regardless of a decision favorable to the Statis, the English "proceedings will likely settle and/or simplify a number of questions relevant to this action." (Docket Entry # 44, p. 4).  Finally, this court posited that if there was a decision favorable to the Statis in the English and/or the Belgium Proceedings, it would lead to a satisfaction of the arbitral award thus disposing "of the need for discovery in this action."[7]  (Docket Entry # 44, p. 5).  In

---

Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 252-253 (D. Mass. 1999); (Docket Entry # 44, p. 2).

[7] As indicated below, the English Court did not decide whether to dissolve the attachment. (Docket Entry # 60, pp. 27, 49, ¶¶ 42, 130).  The decision's import, however, renders a dissolution of the attachment likely given the absence of any obligation on the part of BNYM to pay a debt to ROK and the absence of any claim on the part of ROK against BNYM in relation

January 2020, the District Judge adopted the report and
recommendation, while also noting that "nothing prevents either
party from requesting a lifting of the stay at any time."
(Docket Entry # 52, p. 4, n.3).

In March 2020, the English Court conducted a trial.  (Docket
Entry # 60, p. 18, ¶ 6).  In late April 2020, the court issued a
detailed and thorough opinion and judgment.  In pertinent part,
the court determined that under English law (including conflicts
of law to the extent such law points to foreign law), the cash
sums held by BNYM in the GCA accounts "are part of the National
Fund," and that "[ROK's] ownership of the National Fund does *not*
enable it to claim from BNYM the cash sums owed by BNYM."
(Docket Entry # 60, pp. 18, 26, 45, ¶¶ 7, 37, 109) (emphasis
added).  Applying English law including its conflicts law, the
court declared that BNYM owed obligations under the GCA "solely
to NBK" and not to ROK.  (Docket Entry # 60, p. 49, ¶ 131).  It
also concluded that BNYM "has no obligation to pay any debt" to
ROK under the GCA.  (Docket Entry # 60, p. 49, ¶ 131).  While
acknowledging that its decision might play a "decisive role" in
the Belgium Proceedings, the English Court did not decide the
consequences of its declarations in the Belgium Proceedings or
the outcome of those proceedings, both of which were outside the

---

to the cash assets under English law.  (Docket Entry # 60, p. 49,
¶ 131).  Hence, this justification for the stay no longer carries
much, if any, weight.

scope of the referred declarations, according to the English Court.[8]  (Docket Entry # 60, p. 27, ¶ 42).  In denying the parties' applications for permission to appeal, the English Court directly stated it did not decide whether to release the debt BNYM owed to NBK from the garnishment order but noted that the court's determination(s) "may well inevitably lead to the conclusion that the debt should be released."[9]  (Docket Entry # 60-2, p. 3, ¶¶ 3-4).

ROK, NBK, and the Statis are presently seeking leave to appeal the English Court's decision from the Appeals Court. (Docket Entry ## 60-4, 60-5).  ROK and NBK's joint appeal takes issue with the English Court's refusal to make a final determination on the debt claim in light of the Belgian Court's referral of the entire matter of the merits to the English Court

---

[8]  The English Court pointed out that the Statis did not pursue a prior theory that ROK had a claim against BNYM based on "piercing legal personality" or a "sham trust," as set out in a court-approved list of disputed issues for trial.  (Docket Entry # 60, pp. 21-22, 25 ¶¶ 22, 32) (Docket Entry # 32, p. 16, ¶ 5(g)).  Rather, they relied on agency and trust theories to support their position that BNYM owed a debt to ROK.  (Docket Entry # 60, p. 25, ¶ 32).  The English Court further noted that if the Statis raised these sham trust or fraud matters to the Belgium Court, it will "be a matter for the Belgium Court to determine . . . whether they are estopped from advancing such arguments" based on res judicata as "understood in Belgiam law." (Docket Entry # 60, pp. 28-29, ¶ 46).  The subpoenas in the case at bar and C.A. 19-91214-LTS define ROK to encompass its "alter egos."  (Docket Entry # 2-1, p. 5) (Docket Entry # 3-9, p. 5, C.A. 19-91214-LTS).

[9]  See footnote seven.

8

and the English Court's declarations that, inter alia, BNYM did
not owe a debt to ROK and ROK had no claim against BNYM for the
cash assets.  (Docket Entry # 60-4, ¶¶ 41-62) (Docket Entry # 60,
pp. 27, 49, ¶¶ 42, 130-131).  The Statis' appeal challenges the
English Court's assessment of BNYM's costs against the Statis.
(Docket Entry # 60-5).

        The decision by the English Court provides a thoughtful and
intricate analysis of the relationship between ROK, NBK, and the
National Fund which, in turn, is helpful in ascertaining the
discovery obligations in this action.  The English Court
determined that Kazakh law governed the relationship between ROK
and NBK vis-à-vis NBK's management of National Fund financial
assets under a 2001 Trust Management Agreement ("TMA") whereas
English law determined the significance of any "conferral of
authority" by the principal (purportedly ROK) to the agent
(purportedly NBK).[10]  (Docket Entry # 60, pp. 18, 26, 32, ¶¶ 7,
9, 37, 55).  The court enunciated that Kazakh law allows ROK to
be liable for NBK's obligations when ROK takes on that
responsibility by agreement.  Stated conversely, under Kazakh
law, ROK is not liable for the obligations or debts of NBK except
when ROK takes on that responsibility.  The applicable agreement

---

        [10]  As stated in footnote eight, during the English
Proceedings, the Statis attempted to show that BNYM owed its debt
to ROK under principles of agency and the law of trusts.  (Docket
Entry # 60, p. 25, ¶ 32).

between ROK and NBK (the TMA), read as a whole by the English Court, did not impose that liability onto ROK.[11] (Docket Entry # 60, pp. 18, 34-40, ¶¶ 8, 68-71, 73-74, 76-77, 79, 80-83, 87, 89) (Docket Entry # 22-4).

The court also expounded that NBK, an independent legal entity under Kazakh law, operates under its own name when entering into commercial relations with other parties. (Docket Entry # 60, pp. 18, 39-40, ¶¶ 8, 87). When performing a public function such as developing monetary policy, however, NBK acts in the name of ROK. (Docket Entry # 60, p. 18, ¶ 8). Applying English law, the court reasoned that "'[m]oney paid into a bank account belongs legally and beneficially to the bank'" (BNYM in the English Proceedings) "'and not to the account holder'" (NBK).[12] (Docket Entry # 60, p. 42, ¶¶ 97-98) (internal citation omitted). Contractually, the bank then owes a debt in an

---

[11] Examining the GCA, the English Court determined that NBK, a separate legal entity, did not enter into the GCA with BNYM as ROK's agent. (Docket Entry # 60, pp. 18, 33, 36-37, 39-41, ¶¶ 8, 59, 73-74, 86, 90, 92).

[12] In comparison, "determining ownership of a bank account by reference to the name of the account is a longstanding principle of banking law" and "'[a]ny funds in an account in the name of a foreign central bank are thus funds "of" that foreign central bank.'" Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria, Civil Action No. 08-2026 (PLF), 2019 WL 3562069, at *8 (D.D.C. Aug. 6, 2019) (internal citations omitted), appeal dismissed, No. 19-7107, 2020 WL 1268963 (D.C. Cir. Mar. 4, 2020). Separately, the English Court pointed out that Kazakh law does not recognize a distinction in ownership rights split into legal and beneficial ownerships. (Docket Entry # 60, p. 42, ¶ 96).

equivalent sum to the account holder under English law. (Docket Entry # 60, pp. 42-43, ¶¶ 98, 104).

The English Court also explained that under Kazakh law, title to the assets, such as revenues and cash assets, in the National Fund remains with ROK even though it entrusts NBK with managing the property under trust for ROK's benefit.[13] (Docket Entry # 60, pp. 18, 43-44, ¶¶ 7, 9, 105-106). As found by the English Court, whereas ROK retained ownership of the cash asset funds in the National Fund under Kazakh law, ROK did not have the right under English law to withdraw the funds in the GCA accounts, which were in NBK's name, or the right to claim the cash in the accounts, which was a debt owed by the bank to the account holder and creditor (NBK) under their GCA contract governed by English law.[14] (Docket Entry # 60, pp. 18, 43-45, ¶¶ 7, 9, 105-106, 108-109).

In the case at bar, State Street manages and maintains a "roughly" $900 million account on behalf of NBK, which includes National Fund cash assets.[15] (Docket Entry # 22-13, pp. 11-15,

---

[13]  More specifically, whereas title to the National Fund remained with ROK, it entrusted the National Fund to NBK under the TMA to use and manage the fund for the benefit of ROK as the beneficiary. (Docket Entry # 60, p. 42, ¶ 96).

[14]  Principles of equity under English law also did not enable the English Court to declare that BNYM owed the funds to ROK. (Docket Entry # 60, p. 43, ¶¶ 102-103).

[15]  "State Street Global Advisors" is the State Street entity that managed the account "as of December 2017." (Docket Entry #

22-24, 26, 28, 30) (Docket Entry # 22, p. 6, ¶ 21).  "BNY
Mellon," as the custodian, holds the assets (such as the cash
funds or portfolio of securities) that State Street manages on
behalf of NBK.[16]  (Docket Entry # 22-13, pp. 14-15, 22-23, 25-29,
34) (Docket Entry # 42-1, pp. 4, 8, 24).  In 2001, State Street
and NBK entered into the IMA, which is governed by "the laws of
England."  (Docket Entry # 42-1, p. 14, ¶ 14); (Docket Entry #
42, p. 2, ¶ 3) (describing IMA as "between State Street and
[NBK]").  The IMA instructs that NBK, the customer, "shall
arrange for the Custodian," i.e., BNY Mellon, "to hold the
Portfolio in the Custody Accounts."  (Docket Entry # 42-1, p. 8,
¶ 4).  Further, the contract provides that State Street "shall
not hold, directly nor indirectly, any of [NBK's] Assets and is
not responsible for matters relating to the holding and
administration of such Assets by the Custodian."[17]  (Docket Entry
# 42-1, p. 8, ¶ 4).

     Turning to the arguments regarding the stay, State Street

_____

22, p. 7, ¶ 24).

     [16]  In a March 2018 Rule 30(b)(6) deposition of State Street,
the deponent testified that "BNY Mellon," also referred to as
"Bank of New York Mellon," holds the assets and that State Street
does not have actual possession of the assets.  (Docket Entry #
22-13, pp. 22-23).  An Investment Management Agreement ("IMA")
between State Street, specifically State Street Global Advisors
United Kingdom Limited, and NBK identifies the custodian as
having a London address.  (Docket Entry # 42-1, pp. 2, 4, 24).

     [17]  Neither State Street nor the Statis detail in depth the
terms of the custodial account(s) between NBK and the custodian.

submits that the pendency of the appeals in the Appeals Court warrants keeping the stay in place.  The English Court, however, engaged in detailed fact-finding regarding the relationships between ROK, NBK, and the National Fund.  Where, as here, the English Court rendered a decision clarifying the relationships under English law, which shares a common law heritage with law in the United States, see generally Goldhammer, 59 F. Supp. 2d at 254-255, and issued a judgment, the need for additional clarification to simplify the questions in this proceeding is greatly reduced.  This principle, which provided a basis to impose the stay (Docket Entry # 44, p. 4), no longer carries much weight.

As to the current similarity of any unresolved issue,[18] the Statis' present appeal challenges the English Court's assessment of BNYM's costs against the Statis.  (Docket Entry # 60-5).  ROK and NBK's appeal objects to the English Court's failure to fully adjudicate the debt claim and include a finding that the garnishment order had no subject-matter or content.  (Docket Entry # 60-4).  Even though issues need not be "identical" to warrant a stay, see Landis, 299 U.S. at 254, the current issues on appeal lack significant commonality and similarity with the material issues in the case at bar.  See generally Goldhammer, 59 F. Supp. 2d at 252 (listing "similarity of parties and issues

_____

[18]  See footnote six.

13

involved in the foreign litigation" as a factor).  Furthermore,
in light of the year-long stay to date, the prospect of the
additional delay in awaiting resolution of the appeal
substantially outweighs the need for continuing the stay.  See
Landis, 299 U.S. at 256; An Giang Agrie. and Food Imp. Exp. Co.
v. United States, 350 F. Supp. 2d at 1164 n.3 (noting that Landis
"Court was motivated by the effect of delay on the *Landis*
*plaintiffs*" resulting from stay) (emphasis in original).  Indeed,
the Landis Court found that waiting for a determination of an
appeal "*exceeded*" the limits of any "fair discretion" afforded to
a district court's decision to continue a stay.  See Landis, 299
U.S. at 256 (emphasis added) ("limits of a fair discretion are
exceeded in so far as the stay is to continue in effect after the
decision by the District Court . . . , and until the
determination by this court of any appeal therefrom").

State Street also argues that the Belgium Proceedings, which
the Statis indicate they intend to pursue, necessitate retaining
the stay.[19]  It is true that the English Court left certain
matters unresolved for the Belgian Court to decide.  It is also
true that the issues in the Belgium Proceedings more closely
overlap the issues in the case at bar than the issues presented
to the Appeals Court.[20]  The overlap in issues in this case and

---

[19]   See footnote one.

[20]   See footnote one.

14

the Belgian Proceedings, however, is not extensive and this lesser degree of commonality weakens support for continuing the stay.  Furthermore, the commonality does not outweigh the delay and prejudice to the Statis or, when balancing all of the relevant factors, otherwise justify continuing to defer exercising the jurisdiction conferred on this court by Congress.  See Goldhammer, 59 F. Supp. 2d at 251 ("inherent power to stay parallel litigation must be balanced against the federal courts' 'strict duty to exercise the jurisdiction that is conferred upon them by Congress'") (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)).  In addition, the English Court forecasted in frank terms that its "determination of the issue referred to it by the Belgian court may well inevitably lead to the conclusion that the debt should be released from the garnishment."  (Docket Entry # 60-2, p. 3, ¶ 4).  This court agrees with the likelihood of this forecast.  In sum, the justifications for the stay no longer exist with sufficient force to outweigh the prejudice to the Statis and the obligation of this court to exercise the jurisdiction conferred by Congress.  Hence, the stay is lifted.

Proceeding to the merits, State Street asserts that the judgment rendered by the English Court eliminates any basis for the Statis to obtain discovery in this action.  (Docket Entry # 60, p. 10).  It submits that the discovery sought is not relevant

15

to the income and property of the judgment debtor, ROK.  (Docket
Entry # 8, pp. 20-21).  State Street also points out that it "has
never had *custody* of any *assets* held in the name of NBK."
(Docket Entry # 60, p. 10) (emphasis in original).

Both the Statis and State Street rely on the decision and
judgment of the English Court to justify their positions.
(Docket Entry # 57, pp. 4-5) (Docket Entry # 60).  Adhering to
their premise to consider the English Court's decision and
judgment, it diminishes the relevancy of the requested discovery
but does not eliminate it entirely.  First and foremost, the
breadth of post-judgment discovery under Rule 69 is broad.  See
Republic of Argentina v. NML Capital, Ltd., 573 U.S. 134, 138
(2014) ("rules governing discovery in postjudgment execution
proceedings are quite permissive").  A judgment creditor "may
obtain discovery from *any* person," i.e., parties and non-parties,
under the Federal Rules of Civil Procedure or under "the
procedure of the state where the court is located.  Fed. R. Civ.
P. 69(a)(2).  That said, the principle constraint on such
discovery is "that it must be calculated to assist in collecting
on a judgment."  EM Ltd. v. Republic of Argentina, 695 F.3d 201,
207 (2d Cir. 2012), *aff'd sub nom.* Republic of Argentina v. NML
Capital, Ltd., 573 U.S. 134 (2014).  State Street accurately
submits it "has never had *custody* of any *assets* held in the name
of NBK."  (Docket Entry # 60, p. 10) (emphasis in original).  The

16

record more than adequately supports this fact.  It is BNY
Mellon, the custodian, rather than State Street, which holds the
assets that State Street manages on behalf of NBK in the NBK
account.[21]  (Docket Entry # 22-13, pp. 14-15, 22-23, 25-29, 34)
(Docket Entry # 42-1, pp. 3-4, 8, 24).  State Street also argues,
again correctly under the present record (Docket Entry # 22-4),
that NBK is a separate and distinct legal entity from ROK.
Finally, the State Street bank account is in NBK's name.

    The Statis respond that "NBK assets managed by State Street
are held by the NBK as a custodian or trustee for the ROK."
(Docket Entry # 21, pp. 22-23).  As a matter of Kazakh law, the
documents the Statis submit provide support for the latter
premise insofar as NBK, as trustee, manages the National Fund on
the basis of a Trust Deed between NBK and ROK with the goal of
investing National Fund financial assets to generate a profit for
ROK.  (Docket Entry # 22-4).  When not acting as a public
authority, NBK serves as a legal entity independent from ROK
under Kazakh law.  (Docket Entry # 22-4).  The National Fund is a
sovereign wealth fund created by an ROK Presidential Decree and
does not operate as "a legal entity."  (Docket Entry ## 22-2, 22-
4).

    Exercising this court's discretion, State Street's

---

    [21] United States "courts generally lack authority . . . to
execute against property in other countries."  NML Capital, 573
U.S. at 144.

management role and lack of custody of the National Fund assets
together with NBK's status as a separate legal entity from ROK do
not preclude discovery if State Street has information that could
lead to attachable assets and a resulting collection of the
arbitral award confirmed by the D.C. Court.  Stated conversely,
"information that could not possibly lead to executable assets is
simply not 'relevant' to execution in the first place."  NML
Capital, 573 U.S. at 144-145 (citing Fed. R. Civ. P. 26(b)(1));
Voit Techs., LLC v. Del-Ton, Inc., No. 5:17-CV-259-BO, 2019 WL
3423468, at *1 (E.D.N.C. July 29, 2019) (judgment creditor's use
of Fed. R. Civ. P. Rule 45 subpoena for post-judgment discovery
under Rule 69(a)(2) is "subject to Rule 26's standards for
discoverability," namely, that "parties may obtain discovery . .
. . 'that is relevant'").  In the case at bar, State Street may
have information about ROK assets even if it does not own or hold
such assets in the NBK account.  See Aurelius Capital Master,
Ltd. v. Republic of Argentina, 589 F. App'x 16, 18 (2d Cir. 2014)
(noting that "entity that is closely tied to (but legally
distinct from) Argentina may possess information about
Argentina's assets, even if it does not own or hold those assets
itself") (summary order).

The Statis argue and this court agrees that they have a need
to ascertain information potentially known to State Street,
namely, the identity of a global custodian holding transferred

National Fund assets (Docket Entry # 57-1, p. 10, ¶ 32), in order
to discover the location, possession, and/or custody of ROK
assets to enforce the D.C. judgment confirming the award.
(Docket Entry # 57, p. 7) (Docket Entry # 22, p. 7, ¶ 25).  This
permissible discovery extends to information about assets located
outside the United States.  See NML Capital, 573 U.S. at 140
("'in a run-of-the-mill execution proceeding . . . the district
court would have been within its discretion to order the
discovery from third-party banks about the judgment debtor's
assets located outside the United States'") (internal citation
omitted).  Moreover, the Statis seek discovery concerning the new
custodian not only to enforce the D.C. judgment in the United
States, but also "to enforce foreign court judgments" that
recognize the award in "jurisdictions where the new custodian has
offices."  (Docket Entry # 57, p. 7) (Docket Entry # 22, p. 7, ¶
25).  Such information is encompassed in a number of the topics
in the deposition subpoena.  (Docket Entry # 2-1, Nos. 4, 5,
9).[22]

Turning to the other topics, State Street argues they entail
an undue burden and are overbroad.  (Docket Entry # 8, pp. 8-9,
24-25).  It is well settled that the target of a post-judgment
subpoena may challenge the subpoena on the basis of undue burden

---

[22] These topics are nonetheless overbroad because they cover
a seven-year time period.  (Docket Entry # 2-1, p. 6, ¶ 1).

and overbreadth. <u>See</u> Fed. R. Civ. P. 45(d)(3) ("Rule 45(d)(3)");
<u>Warren Hill, LLC v. SFR Equities, LLC</u>, Civil Action No.
20-MC-00007, 2020 WL 977332, at *1 (E.D. Pa. Feb. 28, 2020) (non-
party served post-judgment subpoena may "move to quash or modify
the subpoena" that "'subjects a person to undue burden'" under
Rule 45(d)(3)) (internal citation omitted); <u>Sec. and Exch. Comm'n
v. Schooler</u>, Case No. 3:16-cv-00517-MMD-WGC, 2016 WL 6821079, at
*4 (D. Nev. Nov. 17, 2016); <u>Lucas v. Jolin</u>, Case No. 1:15-cv-108,
2016, WL 5844300, at *4 (S.D. Ohio Oct. 6, 2016) ("limits on
post-judgment discovery from a non-party by a judgment creditor
are the limits that apply generally to all discovery requests to
a non-party, including such concerns as relevancy and
proportionality (or undue burden)"); <u>Noel v. Bank of N.Y. Mellon</u>,
2011 WL 3279076, at *2 (S.D.N.Y. July 27, 2011) (whether
"'subpoena imposes an "undue burden" depends on factors including
relevance, the need of the party for the documents, the *breadth*
of the document request, the *time period* covered by it, . . . and
the burden imposed'") (emphasis added) (internal citation
omitted); <u>BSN Med., Inc. v. Parker Med. Assocs., LLC</u>, Case No. 10
Misc. 15, 2011 WL 197217, at *2 (S.D.N.Y. Jan. 19, 2011) ("Rule
45 should be read in conjunction with the limitations of
discovery found" in Rule 26 and court "must balance the burden of
production against the need for the requested documents").  A
number of the deposition topics are overbroad and/or unduly

burdensome.  For example, the topics encompass "any debt owed to" NBK in its capacity as manager of the National Fund and any message "received or transmitted by one of State Street's offices or branches identifying" NBK "or any other related party to a transaction." (Docket Entry # 2-1, Nos. 6, 10).  Information regarding collateral or security in connection with a debt owned by NBK or NIC is also relatively tangential to the discovery of ROK assets possibly subject to attachment and execution.  (Docket Entry # 2-1, Nos. 14, 15).  The seven-year time period applicable to the deposition topics is undeniably overbroad.

In light of the foregoing guidance, the Statis are instructed to narrow the subpoena.  The parties are directed to meet and confer thereafter in an effort to narrow and resolve the dispute as well as the subpoena duces tecum dispute in C.A. 19-91214-LTS.[23]  In this respect, the briefing requested by the Statis (Docket Entry # 57, p. 7) is therefore allowed subject to a five-page limit inasmuch as the briefing to date (Docket Entry ## 2, 8, 21, 30, 57, 60) spans more than 100 pages.

<u>CONCLUSION</u>

The motion to lift the stay (Docket Entry # 57) is **ALLOWED.** Consistent with the guidance provided in this opinion, the Statis

---

[23]  This court did not address all of the arguments raised by the parties in the filings, which it reserves for further proceedings, if such proceedings are necessary.  These arguments include the protections afforded under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 et seq.

are instructed to narrow the deposition subpoena.  The parties
are directed to meet and confer thereafter in order to narrow and
resolve the dispute.  In the event the parties fail to resolve
their dispute, they may file briefs limited to five pages on or
before July 6, 2020.  This court will conduct a status conference
on July 9, 2020, at 2:30 p.m.[24]

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[24]  Because this Memorandum and Order references content of a
sealed filing (Docket Entry # 42-1), it shall remain under seal
for two weeks after docketing.  Absent an objection to unsealing
filed within the next two weeks, the Clerk will unseal the
opinion.